**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
Don Springmeyer (SBN 1021)
Bradley S. Schrager (NSB 10217)
Daniel Bravo (NSB 13078)
3556 E. Russell Road, 2nd Floor
Las Vegas, Nevada 89120
Telephone: (702) 341-5200
Facsimile: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
dbravo@wrslawyers.com

**LABATON SUCHAROW LLP**
Christopher J. Keller (*pro hac to be submitted*)
Eric J. Belfi (*pro hac to be submitted*)
Francis P. McConville (*pro hac to be submitted*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> PLAYAGS, INC., DAVID LOPEZ, KIMO AKIONA, DAVID SAMBUR, DANIEL COHEN, ERIC PRESS, YVETTE LANDAU, ADAM CHIBIB, GEOFF FREEMAN, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., JEFFERIES LLC, MACQUARIE CAPITAL (USA) INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC., STIFEL, NICOLAUS & COMPANY INCORPORATED, SUNTRUST ROBINSON | Case No.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

*Caption Continued on Next Page...*

1 │ HUMPHREY, INC., NOMURA SECURITIES
INTERNATIONAL, INC., ROTH CAPITAL
2 │ PARTNERS, LLC, UNION GAMING
SECURITIES LLC, THE WILLIAMS
3 │ CAPITAL GROUP, L.P., APOLLO GLOBAL
SECURITIES, LLC, MORGAN STANLEY &
4 │ CO LLC, APOLLO GLOBAL
MANAGEMENT, LLC, APOLLO GAMING
5 │ HOLDINGS, L.P., APOLLO INVESTMENT
FUND VIII, L.P., and AP GAMING VOTECO,
6 │ LLC

7 │ Defendants.

8

9        Plaintiff Oklahoma Police Pension and Retirement System ("Plaintiff"), individually and

10 on behalf of all others similarly situated, by and through its attorneys, alleges the following upon

11 information and belief, except as to those allegations concerning Plaintiff, which are alleged

12 upon personal knowledge.  Plaintiff's information and belief is based upon, among other things,

13 its counsel's investigation, which includes without limitation: (i) review and analysis of

14 regulatory filings made by PlayAGS, Inc. ("PlayAGS" or the "Company") with the United States

15 ("U.S.") Securities and Exchange Commission ("SEC"); (ii) review and analysis of press

16 releases and media reports issued by and disseminated by PlayAGS; and (iii) review of other

17 publicly available information concerning PlayAGS.

18 **I.      SUMMARY OF THE ACTION AND OVERVIEW**

19        1.      Plaintiff brings this securities class action (the "Action") on behalf of all persons

20 or entities who purchased or otherwise acquired PlayAGS common stock during the period from

21 May 3, 2018 through August 7, 2019, both dates inclusive (the "Class Period"), against the

22 Exchange Act Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the

23 Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule l0b-5 promulgated

24 thereunder.

25        2.      Plaintiff also brings the Action on behalf of all persons and entities that purchased

26 or otherwise acquired PlayAGS common stock pursuant and/or traceable to: (i) the registration

27 statement, prospectus, and prospectus supplement (the "August 2018 SPO Materials") issued in

28 connection with the Company's August 2018 offering (the "August 2018 SPO"); and/or (ii) the

registration statement, prospectus, and prospectus supplement (the "March 2019 SPO Materials") issued in connection with the Company's March 2019 offering (the "March 2019 SPO"), against the Securities Act Defendants (as defined herein) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

3.      Under Sections 11 and 12(a)(2) of the Securities Act, the Securities Act Defendants are strictly liable for any false and misleading statements in the August 2018 SPO Materials and March 2019 SPO Materials (together, the "PlayAGS Offering Materials"). Plaintiff therefore expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct as to the Securities Act claims.

4.      Based in Las Vegas, Nevada, PlayAGS is a designer and supplier of electronic gaming machines ("EGMs"), primarily to Native American tribal customers.  The Company operates through three business segments: (i) EGM Segment, which accounts for approximately 95 percent of the Company's revenue, and consists of a library of hundreds of proprietary game titles; (ii) Table Products, which encompasses more than 40 table product offerings, including live felt table games, side bet offerings, progressives, card shufflers, signage, and other ancillary table game equipment; and (iii) Interactive, which traditionally offered Business-to-Consumer ("B2C") social casino games including online versions of the Company's game titles, and following the June 2018 acquisition of Gameiom Technologies Limited (formerly known as "Gameiom", and currently known as "AGS iGaming"), also offers a Business-to-Business ("B2B") platform for content aggregation used by real-money gaming ("RMG") and sports-betting partners.

5.      Most of the Company's EGMs are electronic slot machines that generate revenue for the Company through percentage-based fee-sharing agreements with casinos or fixed-price leasing arrangements.  The Company generates a significant amount of its revenues from EGMs that are placed in Native American casinos located in Oklahoma.  In 2019, Oklahoma-based revenue accounted for approximately 24 percent of the Company's total revenue.

6.      In December 2013, Apollo Global Management, LLC ("Apollo"), through its affiliates: Apollo Gaming Holdings, L.P. ("Apollo Gaming"), Apollo Investment Fund VIII, L.P.

("Apollo Investment"), and AP Gaming VoteCo, LLC ("VoteCo") (together, "Apollo Group"), acquired PlayAGS. At the start of the Class Period, Apollo, through Apollo Group, beneficially held the majority of the Company's common stock, and was therefore PlayAGS' controlling stockholder.

7. On August 6, 2018, PlayAGS filed a shelf registration statement with the SEC on Form S-3 (the "Shelf Registration Statement"), which was declared effective by the SEC on August 8, 2018. Pursuant to the Shelf Registration Statement, the Company registered for resale, on behalf of Apollo Gaming, 18,970,161 shares of common stock, for an offering price of up to $1 billion, which shares were permitted to be sold on a rolling basis.

8. On August 10, 2018, the Company filed a prospectus supplement on Form 424B1 with the SEC which, together with the Shelf Registration Statement, forms part of the August 2018 SPO Materials. In the August 2018 SPO, PlayAGS, on behalf of Apollo Gaming, registered for resale up to an aggregate of 6,325,000 shares of its common stock, including the underwriter allotment of 825,000 shares, at the public offering price of $29.25 per share. Net of underwriting discounts and commissions, the August 2018 SPO was valued at $154,037,812.50. Directly prior to the August 2018 SPO, Apollo Group held approximately 52 percent of PlayAGS common stock, and held approximately 34 percent following its completion.

9. On March 20, 2019, the Company filed a prospectus supplement on Form 424B1 with the SEC, which, together with the Shelf Registration Statement, forms part of the March 2019 SPO Materials. In the March 2019 SPO, PlayAGS, on behalf of Apollo Gaming, registered for resale up to an aggregate of 4,000,000 shares of its common stock at the public offering price of $25.50 per share. Net of underwriting discounts and commissions, the March 2019 SPO was valued at $100,000,000. Directly prior to the March 2019 SPO, Apollo Group held approximately 33 percent of PlayAGS common stock, and held approximately 22 percent following its completion.

10. The PlayAGS Offering Materials all touted the Company's purported competitive strengths and key growth strategies. These growth strategies included the optimization of the Company's older, underperforming EGMs with newer, more profitable EGMs. In the PlayAGS

Offering Materials, the Company discussed the success of this strategy that has been in place since 2016 and highlighted how this strategy had recently been effective at a casino in Oklahoma.  Another touted growth strategy in the PlayAGS Offering Materials was the Company's placement of new Class II EGMs within its existing markets.[1]

11.     At the time of the August 2018 SPO and March 2019 SPO (together, the "PlayAGS Offerings") as well as throughout the Class Period, Defendants made materially false and/or misleading statements and/or omissions.  Specifically, the PlayAGS Offering Materials and Defendants' Class Period statements were false and/or misleading because they omitted that: (i) PlayAGS' growth strategies were failing; (ii) the Company was experiencing major execution issues in Oklahoma; (iii) therefore, the Company's purported competitive strengths were not reasonably likely to lead to increased revenue; (iv) the Company's internal controls over financial reporting were not effective; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

12.     The true state of PlayAGS' financial well-being, growth prospects, and internal controls over financial reporting were revealed to investors on August 7, 2019, when the Company reported its second quarter 2019 results.  On that date, PlayAGS shocked the market by reporting a net loss of $7.6 million, or negative $0.21 earnings per share (versus expectations of positive $0.14 per share).  This loss included an impairment of goodwill of $3.5 million and an impairment of intangible assets of $1.3 million related to the acquired AGS iGaming business within its Interactive segment.  The Company also reported disappointing quarterly revenues of $74.5 million (or growth of 2 percent year-over-year), and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $35.7 million (down 2 percent year-over-

---

[1]  EGMs that are located in casinos at Native American reservations are classified under the federal Indian Gaming Regulatory Act as either Class II machines or Class III machines. While Class II and Class III EGMs look the same to a player, there are several differences between them.  First, the winning odds for a player are generally better for Class III EGMs. Second, Class II EGMs are self-regulated by Native American tribes while Class III EGMs are regulated by the respective U.S. state.  Based on these differences, Class II EGMs are more prevalent in Native American casinos.

year).  PlayAGS also lowered its full-year 2019 adjusted EBITDA guidance to a range of $145 million to $150 million (or growth of 6 to 10 percent year-over-year), down from its previous guidance of a range of $160 million to $164 million.

13.      PlayAGS attributed the weak results to product underperformance at three Oklahoma properties and problems with its placement of 800 incremental EGMs into the Oklahoma market over the past year, as well as the iGaming impairment charges and an increase in research and development operating expenses as part of its strategic growth initiatives.

14.      That same day, during an earnings call with analysts and investors, the Company's Chief Executive Officer ("CEO"), Defendant David Lopez ("Lopez"), provided more detail about the Company's failed growth initiatives in Oklahoma, stating:

> [W]e are experiencing some challenges in Oklahoma, where we have our largest base of recurring revenue, EGMs.
>
> We mentioned several factors for decreased [revenue per day] earlier and one of the issues we are actively working to fix is product underperformance.  I'll give you some color on what's driving this.  ***Over the past year***, we've grown our Oklahoma footprint with 800 incremental units and separately optimized numerous existing units. Some of the underperformance is a result of going too hard and fast into the market with certain products. We also went too deep into our portfolio of titles, where we should have focused on our most successful game themes.

(emphasis added).

15.      In reaction to these disclosures, analysts expressed their concerns and immediately downgraded PlayAGS stock.  The news was of such surprise to Bank of America Merrill Lynch that it downgraded its rating on PlayAGS stock by two levels (from "Buy" to "Underperform") and slashed its PlayAGS price target by over 50 percent from $30 to $14, citing concerns of faltering growth.

16.      On this news, PlayAGS stock dropped $8.99 per share, or 52 percent, to close at $8.31 per share on August 8, 2019.

17.      By the commencement of this Action, PlayAGS stock was trading as low as $3.58 per share, an approximately 88 percent decline from the $29.25 per share August 2018 SPO price, and 86 percent decline from the $25.50 per share March 2019 SPO price.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v(c)), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's principal executive offices are located in this district.

22.     In connection with the acts, transactions, and conduct alleged herein, the Exchange Act Defendants (defined herein) directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     BACKGROUND FOR ALL CLAIMS ASSERTED HEREIN

23.     Based in Las Vegas, Nevada, PlayAGS is a designer and supplier of EGMs.  The Company operates through three business segments: (i) EGM Segment, which accounts for approximately 95 percent of the Company's revenue, and consists of a library of hundreds proprietary game titles; (ii) Table Products, which encompasses more than 40 table product offerings, including live felt table games, side bet offerings, progressives, card shufflers, signage, and other ancillary table game equipment; and (iii) Interactive, which traditionally offered B2C social casino games including online versions of the Company's game titles, and following the June 2018 acquisition Gameiom, currently known as AGS iGaming, also offers a B2B platform for content aggregation used by RMG and sports-betting partners.

24.     Most of the Company's EGMs are electronic slot machines that generate revenue for the Company through percentage-based fee-sharing agreements with casinos or fixed-price leasing arrangements.   PlayAGS focuses on supplying its EGMs to the Native American gaming market.  The Company generates a significant amount of its revenues from EGMs that are placed in Native American casinos located in Oklahoma.  In 2019, Oklahoma-based revenue accounted for approximately 24 percent of the Company's total revenue.

25.     In December 2013, Apollo, through the Apollo Group,  acquired PlayAGS.  At the start of the Class Period, Apollo, through Apollo Group, beneficially held the majority of the Company's common stock, and was therefore PlayAGS' controlling stockholder.

## IV.     SUBSTANTIVE ALLEGATIONS FOR VIOLATIONS OF THE EXCHANGE ACT

26.     The claims set forth herein pursuant to Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, are based on knowing or reckless misconduct by the Exchange Act Defendants.  These claims are independent of the Securities Act Claims asserted herein and the allegations of fraud pertaining to the claims under the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

### A.     Parties

27.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired PlayAGS common stock during the Class Period, and suffered damages as a result of the violations of the Exchange Act alleged herein.

28.     Defendant PlayAGS is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada.  PlayAGS's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "AGS."

29.     Defendant Lopez was, at all relevant times, the PlayAGS' CEO, as well as a Director of the Company.

30.     Defendant Kimo Akiona ("Akiona") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company.

31.     For the purposes of the Exchange Act violations alleged herein, Lopez and Akiona, may hereafter be referred to at times as the "Individual Exchange Act Defendants."  The Individual Exchange Act Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Exchange Act Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or  misleading.  The Individual Exchange Act Defendants are liable for the false statements pleaded herein.

32.     Defendant Apollo, through Apollo Group, acquired PlayAGS in 2013.  At the start of the Class Period, Apollo beneficially held over 50 percent of the Company's common stock.

33.     Defendant Apollo Gaming, as part of Apollo Group, acquired PlayAGS in 2013. At the start of the Class Period, Apollo Gaming held over 50 percent of the Company's common stock.

34.     Defendant Apollo Investment, as part of Apollo Group, acquired PlayAGS in 2013.  Apollo Investment is a member of Apollo Gaming Holdings GP, LLC ("Apollo Gaming GP"), the general partner of Apollo Gaming.  At the start of the Class Period, Apollo Investment beneficially held over 50 percent of the Company's common stock.

35.     Defendant VoteCo, as part of Apollo Group, acquired PlayAGS in 2013.  At the start of  the Class Period, VoteCo beneficially held over 50 percent of the Company's common stock pursuant to an irrevocable proxy granting it sole voting and sole dispositive power with respect to the shares held by Apollo Gaming.  VoteCo is owned and controlled by Apollo affiliates.

36.     For the purposes of the Exchange Act violations alleged herein, PlayAGS, the Individual Exchange Act Defendants, Apollo, and Apollo Group, may hereafter be referred to at times as the "Exchange Act Defendants."

**B.     Materially False and Misleading Class Period Statements**

37.     The Class Period begins on May 3, 2018.  On that date, PlayAGS announced its first quarter 2018 financial results, reporting a 36 percent year-over-year increase in total revenue over the prior year period to $64.9 million.  Also according to the earnings release, in the first quarter 2018, PlayAGS sold 838 EGMs, up 85 percent year-over-year.  Finally, the Company reported that net loss improved to $9.5 million from $12.4 million. Moreover, PlayAGS increased its guidance.  The press release stated, in relevant part:

**First Quarter Financial Highlights**

- Total revenue increased 36% to $64.9 million, a company record, driven by continued growth of our EGMs in the Class III marketplace, led by demand for our newer premium Orion Portrait cabinet.

- Recurring revenue grew to $49.6 million or 23% year-over-year, primarily attributable to the contribution of EGMs purchased from Rocket Gaming and Table Products purchased from In Bet in the Fall of 2017, as well as our yield optimization efforts and the popularity of the Orion Portrait cabinet.

- EGM equipment sales increased 107% to $15.2 million, another company record, due to the sale of 838 units, approximately 60% of which were Orion Portrait cabinet.

- Adjusted EBITDA increased to $34.5 million, or 39%, driven by an increase in revenue, and partially offset by increased adjusted operating expenses of $3.8 million primarily due to increased headcount in our R&D studios including our new studio in Sydney, Australia.

- Total adjusted EBITDA margin increased to 53% in the first quarter 2018 compared to 52% driven by several different factors, most notably due to the operating leverage from the assets purchased from Rocket Gaming.

- SG&A expenses increased $6.5 million in the first quarter of 2018 primarily due to an initial non-cash charge of $6.2 million in stock based compensation recorded in connection with the IPO, as well as increased costs due to higher headcount.

- R&D expenses increased $3.3 million in the first quarter of 2018 driven by an initial non-cash charge of $1.6 million in

10

stock based compensation recorded in connection with the IPO, as well as increased headcount, and the development of our new Orion Slant cabinet and DEX S card shuffler.

- Net loss also improved to $9.5 million from $12.4 million, which included non-cash stock based compensation in the current quarter of $8.2 million versus no non-cash stock based compensation in the prior year.

\* \* \*

**2018 Outlook**

Based on our year-to-date progress and due to our current momentum, we now expect our adjusted EBITDA in 2018 to be between $126 and $131 million. This is an upward revision to the guidance we previously released and is based on greater visibility that we now have for Orion Portrait and other products throughout the year. We maintain our capital expenditures range of $55 to $60 million.

38.     Additionally in the earnings release, Defendant Lopez was quoted touting the expansive growth in PlayAGS' EGM Segment, stating in relevant part:

"The first quarter of 2018 was absolutely tremendous for AGS - we achieved records in every key category, including revenue, adjusted EBITDA, average selling price, and recurring revenue. We reported the most EGM sales revenue in our company's history with 838 units sold, driven largely by the continued success of the Orion Portrait cabinet, while our Tables and Interactive segments both reported their strongest EBITDA quarters to date," said David Lopez, President and CEO of AGS.  "With industry-leading game performance and the recent introduction of the new Orion Slant, AGS shows no signs of slowing down and we are confident that 2018 will be our best year yet."

39.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018, affirming the previously reported financial results.  The report also stated that the Company's disclosure controls and procedures were effective.

40.     Additionally on May 3, 2018, PlayAGS held an earnings call with analysts and investors to discuss the Company's first quarter 2018 financial results.  On the call, Defendant Lopez discussed the Company's Oklahoma expansion, as well as the successful execution of PlayAGS' legacy EGM optimization strategy, stating in relevant part:

Turning to our EGM segment on Slide 5. We ended Q1 with a total recurring EGM base of 24,033 units up 13% year-over-year. In addition to the inclusion of the Rocket EGMs, recurring unit growth was bolstered by the 4 wins opening in Q1 where AGS received approximately 14% of the floor. Additionally, we

11

benefited from a couple of expansions in Oklahoma. We continue to execute on our yield optimization strategy upgrading 1650 of our legacy machines on a trailing 12 month basis with our latest high-performing products. This mission serves to grow our recurring revenue and protect our base as well as support our loyal long-term customers by providing them with our newer, more profitable products. As of Q1, approximately $5.6 million of our recurring revenue came from our optimization efforts over the past two years. We sold 838 EGMs for a total of $15.2 million in sales revenue for the quarter up 107% over the prior year period.

41.     Additionally on the call, Defendant Akiona attributed EGM Segment revenue growth, in part, to the expansion of PlayAGS' Oklahoma business, stating in relevant part:

Turning to our EGM segment, gaming operations revenue increased 22% in the first quarter to a record $46 million. The year-over-year increase primarily reflects a larger domestic install base that grew by over 2500 units or 18%. Approximately, 1500 of the unit increase was from the Rocket Gaming asset acquisition and the remaining organic increase was led by increases in Texas, Nevada, Florida and California. Also in the first quarter, we saw the install base grow in Indiana and Oklahoma by nearly 500 units from new casino openings and expansions notably the 4 wins property in Indiana where we installed nearly 250 units in the quarter.

42.     On June 19, 2018, PlayAGS announced that it had acquired Gameiom, which would become part of the Company's Interactive business. In a press release, the Company stated, in relevant part:

AGS ("the Company") (NYSE: AGS) announced today it has acquired Gameiom Technologies Limited ("Gameiom"), a UK and Gibraltar licensed iGaming aggregator and content provider for real-money gaming ("RMG") and sports-betting partners. This transaction bolsters AGS' diverse product portfolio with the ability to offer iGaming operators some of the highest-performing game content in the marketplace through Gameiom's remote game server ("RGS"). Under the terms of the transaction, AGS has acquired Gameiom for $5 million in cash and will integrate Gameiom to serve as the launchpad for the Company's iGaming division, which will become part of its AGS Interactive business segment.

"In assessing RMG providers, AGS felt it was important to pursue a pure content aggregation and distribution platform as opposed to a direct-to-consumer iGaming operation," said David Lopez, President and CEO of AGS. "Gameiom fits that bill perfectly – their platform enables AGS to distribute our industry-leading game content into many markets, including the U.S, establishing a real-money gaming solution designed to generate revenue for AGS and our partners. Gameiom's RGS platform is flexible, scalable, robust, and open, capable of delivering hundreds of games and sports-betting integration to operators quickly and reliably. More importantly, Gameiom's values align with our playbook – they are

12

passionate, team oriented, aspire to win, and a bit obsessed with gaming, just like us."

43.    On August 2, 2018, PlayAGS announced its second quarter 2018 financial results, reporting a 45 percent increase in total revenue over the prior year period to $72.8 million.  The press release also reported a 144 percent increase in EGM sales, based on quarterly sales of 1058 units.  Again, PlayAGS increased its guidance.  The press release stated, in relevant part:

**Second Quarter Financial Highlights**

- Total revenue increased 45% to $72.8 million, a company record, driven by continued growth of our EGMs in the Class III marketplace, led by demand for our premium Orion Portrait cabinet.

- Recurring revenue grew to $52.6 million or 26% year-over-year. In addition to the contribution from the EGMs purchased from Rocket Gaming and Table Products purchased from In Bet in the Fall of 2017, the increase was driven by our strong Domestic revenue per day ("RPD") of $27.79, up $1.90 year-over-year.

- EGM equipment sales increased 144% to $20.2 million, another Company record, due to the sale of 1,058 units, of which approximately 60% and 12% were Orion Portrait and Orion Slant cabinets, respectively.

- Net loss improved to $5.3 million from $20.1 million in the prior year, primarily due to increased revenue described above.

- Total Adjusted EBITDA (non-GAAP) increased to $36.6 million, or 40%, driven by the significant increase in revenue, partially offset by increased adjusted operating expenses of $3.9 million primarily due to increased headcount in SG&A and R&D.(1)

- Total Adjusted EBITDA margin decreased to 50% in the second quarter 2018 compared to 52% in the prior year driven by several different factors, most notably due to the increased proportion of equipment sales to total revenues.

- SG&A expenses increased $5.0 million in the second quarter of 2018 primarily due to $2.3 million in increased professional fees driven by costs associated with the acquisition of online content-aggregator Gameiom as well as costs associated with our previous offerings. Salary and benefit costs increased $1.8 million due to higher headcount and non-cash stock based compensation expense increased $0.3 million.

- R&D expenses increased $0.7 million in the second quarter of 2018 driven by higher salary and benefit costs related to additional headcount.

* * *

**2018 Outlook**

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $132.0 and $136.0 million. This is an upward revision to the guidance we previously released and is based on greater visibility that we now have for the installation and performance of Orion Portrait, Orion Slant, STAX, and other products for the remainder of the year, in addition to accelerated efforts to increase our footprint in sizable new markets, such as Canada. We maintain our capital expenditures range of $55.0 to $60.0 million.

44.    In the earnings release, Defendant Lopez was quoted touting the Company's record results, including in the EGM Segment, and attributed the increased guidance to opportunities in the EGM Segment, stating in relevant part:

"AGS grew both the top and bottom line by more than 40% in the second quarter, marking the most successful quarter in our company's history. Our strong results reflect record highs in our EGM and Tables Products revenue, average selling prices, revenue per day, and recurring revenue. We continue to reap the benefits of our Orion and Bonus Spin product launches, our steady ramp into key markets like Nevada, California and New Jersey, and strong performance from both our optimized and new product footprint.

In addition to a strong pipeline of new product launches and our initial entry into markets such as Canada to accelerate our growth, our recent acquisition of content-aggregator Gameiom creates a new channel to exploit our industry-leading game content in online real-money gaming markets. Because of the potential upside from these exciting opportunities in our EGM business and our strong first half of the year, we are raising our Adjusted EBITDA guidance to reflect a new range of $132 million to $136 million."

45.    That same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018, affirming the previously reported financial results.  The report also stated that the Company's disclosure controls and procedures were effective. Regarding goodwill related to the Gameiom acquisition, the report stated, in relevant part:

During the quarter ended June 30, 2018, the Company acquired all of the equity of Gameiom Technologies Limited (formerly known as "Gameiom", currently known as "AGS iGaming"). AGS iGaming is a licensed Gaming aggregator and content provider for real-money gaming ("RMG") and sportsbetting partners. The acquisition was accounted for as an acquisition of a business and the assets acquired and liabilities assumed were measured based on our preliminary estimates of their fair values at the acquisition date. The estimated fair values of assets acquired and liabilities assumed and resulting goodwill are subject to adjustment as we

14

finalize our fair value analysis. The significant items for which a final fair value has not been determined as of the filing of this report include the fair value of intangible assets. We expect to complete our fair value determinations no later than one year from the acquisition date.

We attribute the goodwill acquired to our ability [to] utilize AGS iGaming's existing RMG platform to distribute our existing EGM game content into many markets, diversification of our Interactive segment's product portfolio that now includes a real-money gaming solution and other strategic benefits. Total consideration of $5.0 million included cash paid of $4.5 million and $0.5 million of deferred consideration that is payable within 18 months of the acquisition date. The consideration was  allocated primarily to goodwill  that is  not  tax deductible for $3.1 million and intangible assets of $2.7 million, which will be amortized over a weighted average period of approximately 6.6 years.

The intangible assets consist primarily of customer relationships and a technology platform.

46. Additionally on August 2, 2018, PlayAGS held an earnings call with analysts and investors to discuss the Company's second quarter 2018 financial results.  On the earnings call, Defendant Lopez touted that PlayAGS was successfully executing its legacy EGM optimization strategy, stating in relevant part:

We've made good progress with our yield optimization strategy, upgrading nearly 1,500 of our legacy machines on a trailing 12-month basis with our latest high-performing products. We are now starting to see real RPD improvement as the base of upgraded units continues to grow. As of Q2, approximately $8.3 million of trailing 12-month recurring revenue came from our optimization efforts in both the U.S. and Mexico.

As a result of optimization, growing the recurring footprint with new, high-performing product, and the overall health of our poor tribal markets, domestic RPD grew to its highest level in years, averaging $27.79 in Q2. This grew $1.90 from the prior-year period, and $1.07 sequentially.

47. Also on the call, Defendant Akiona attributed the Company's increased domestic revenue per day ("RPD") to the Company's new product offerings, as well as the execution of its legacy EGM optimization growth strategy, and specifically noted "strong performance" in Oklahoma, stating in relevant part:

Total RPD for the current quarter also increased by 8.9%, to $21.77 cents compared to the second quarter of 2017, driven primarily by our new product offerings and through the optimization of our install base with our industry-leading EGMs.

15

Notable was strong performance in certain key markets like Oklahoma, Texas, Florida, and California, just to name a few.

48.     On November 8, 2018, PlayAGS announced its third quarter 2018 financial results, reporting that total revenue had increased 34 percent over the prior year to $75.5 million. The earnings release reported that EGM equipment sales had again increased, this time by 82 percent year-over-year, based on quarterly sales of 1,332 units.  Yet again, the Company increased its guidance. The press release stated, in relevant part:

**Third Quarter Financial Highlights**

- Total revenue increased 34% to $75.5 million, a Company record, driven by continued growth of our EGMs in the Class III marketplace, including entry into Alberta, Canada as well as a large sale to a long-standing tribal customer.

- Recurring revenue grew to $50.7 million, or 18% year-over-year. In addition to the contribution from the EGMs purchased from Rocket Gaming, the increase was driven by our strong domestic revenue per day ("RPD") of $27.14, up $1.70 year-over-year as well as increases in Table Products revenue driven by an increase in Table Product units.

- EGM equipment sales increased 82% to $24.7 million, another Company record, due to the sale of 1,332 units, of which approximately 24% were sold in Canada and 276 units were sold to a long-standing tribal customer.

- Net income improved to $4.3 million from a net loss of $4.1 million in the prior year period, primarily due to the increased revenue described above.

* * *

**2018 Outlook**

Based on our year-to-date progress and due to our current momentum, we now expect our total Adjusted EBITDA in 2018 to be between $134.0 and $136.0 million. This is an upward revision to the guidance we previously released and is based on our progress executing against our many growth initiatives in the first half of the year and due to our improved visibility for the remainder of the year.

49.     Additionally in the earnings release, Defendant Lopez was quoted touting the Company's record EGM sales, stating in relevant part:

AGS President and Chief Executive Officer David Lopez said, "In the third quarter, AGS sold 1,332 EGMs, a 58% jump year-over-year, and a company record. Revenue hit an all-time high of $75.5 million, demonstrating continued demand for our Orion Portrait

16

> cabinet and growing momentum for our new Orion Slant, in addition to significant progress in Canada, with 24% of our sold EGMs placed in several Canadian provinces. Our Tables segment posted its best quarter to date, with our innovative progressives contributing to a 30% increase in installs year-over-year. AGS is still very underrepresented in many markets both domestically and internationally, which presents significant long-term growth opportunities for the Company due to our industry-leading game performance, an expanding suite of cabinet options, best-in-class R&D, and diversified product offerings."

50.     That same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, affirming the previously reported financial results.  The report also stated that the Company's disclosure controls and procedures were effective.

51.     Also on November 8, 2018, PlayAGS held an earnings call with analysts and investors to discuss the Company's third quarter 2018 financial results.  On the call, Defendant Lopez stated that PlayAGS had continued to penetrate the "healthy" Oklahoma market, stating in relevant part:

> So it's all about going out there and getting to the jurisdictions. You know what they are, mostly. But we stay focused. And we look at Oklahoma, and you look at our penetration in Oklahoma, but we continue to add units in Oklahoma. It continues to be a healthy market for us. We're having units in every corner of the U.S., Canada and Mexico, wherever we know that it's a strong lease jurisdiction. So we just stay focused on that. It's going to be a huge focus obviously in Q4 and beyond and exactly something that when we look at 2019 that we're going to stay focused on.

52.     Defendant Lopez additionally informed the market that PlayAGS was making "good progress" in regards to the Company's legacy EGM optimization strategy within its recurring install base, stating in relevant part:

> When thinking about the recurring install base, it's important to think about the quality of our base in addition to its size. So while we will be up slightly in the recurring units over 2017, it's with a better mix of units positively impacting our RPD. This is part of our ongoing optimization strategy, and we will always look for the highest return on invested capital for our equipment.

> We continue to make good progress with this strategy, upgrading more than 880 of our legacy machines year-to-date. As a result of optimization, growing the recurring footprint with new high-performing product and the overall health of our core tribal markets, domestic RPD grew by $1.70 year-over-year, to $27.14.

53. Additionally on the November 8, 2018, earnings call, Defendant Akiona touted that PlayAGS' domestic RPD had increased $1.70 year-over-year to $27.14, due to new EGM offerings and the optimization of existing EGMs within the Company's install base, including in the Oklahoma market, stating in relevant part:

> Domestic RPD for the current quarter increased by $1.70, to $27.14, compared to the third quarter of 2017, driven primarily by our new product offerings and through the ongoing optimization of our install base with our industry-leading EGMs. Notable increases were seen in certain markets like Oklahoma, Texas, Florida, California and Washington, to name a few. International RPD for the current quarter also increased, by $0.19, to $8.52, compared to the third quarter of 2017, driven by the optimization of our install base.

54. In response to analyst questions regarding expansion in the Oklahoma market, Defendant Lopez further attested to the health of, and upcoming expansion in, the Company's Oklahoma market,  stating in relevant part:

> So as far as the risk goes, we don't see anything just yet, and I think it'd be very early in the game to talk about how Arkansas casinos could risk anything up in Oklahoma. I don't think that we will see the Oklahoma customer going to Arkansas. And I'd also say that Oklahoma sort of has some of the finest operators out there in the country, and they're going to, in the words of our president, secure their borders, if you will. They're going to: a) make sure that their players stay in the state and; b) they're going to continue to draw players from other states because they do what they do and they do it very well.
>
> So I think that – and as far as upside goes, nothing specific, but we always say modest growth in those jurisdictions, modest growth in Class II and modest growth in Oklahoma. Now they do have some projects that are coming online. We haven't sort of published numbers on what we're going to do in those arenas yet, but they do have some expansions and some new projects that are coming online. And we'll obviously continue to get our fair share, if you will, of the Chickasaw market as they expand and as every other tribe in Oklahoma expands, as well.

55. On March 5, 2019, PlayAGS announced its fourth quarter and full year 2018 financial results, reporting that total revenue had increased 25 percent over the prior year to $72.1 million.  The earnings release reported that EGM equipment sales had again increased, this time by 86 percent, based on quarterly sales of 1,159 units.  The Company also gave adjusted

EBITDA guidance for 2019 in the range of $160.0 to $164.0 million.  The press release stated, in relevant part:

**Fourth Quarter 2018 Financial Highlights**

- Total revenue increased 25% to $72.1 million, driven by continued growth in our EGM segment in the Class III marketplace, primarily in early-entry markets such as Ontario, Mississippi and Nevada as well as continued penetration into ramping markets such as California and Florida.

- EGM equipment sales increased 86% to $23.2 million, due to the sale of 1,159 units, of which nearly 60% were sold into early-entry markets.

- Gaming operations revenue, or recurring revenue, grew to $48.9 million, or 8% year-over-year, driven by EGMs purchased from Rocket Gaming, increased domestic revenue per day ("RPD") of $26.41, growth and performance of our international installed base, and an increase in Table Products revenue.

- Net loss of $10.3 million increased year-over-year from a net loss of $8.5 million. Fourth quarter 2018 net loss includes a non-cash, pre-tax impairment of goodwill of $4.8 million related to our social gaming business within our Interactive Social reporting unit.

- This goodwill related to our acquisition of RocketPlay in 2015. The impairment charge was recorded within write downs and other charges in our consolidated statements of operations and comprehensive loss.

- Total Adjusted EBITDA (non-GAAP)(2) increased to $31.5 million, or 19%, driven by the significant increase in revenue, partially offset by increased operating expenses primarily due to headcount related costs in SG&A and R&D. Included in that amount was approximately $1.0 million of operating costs from our real-money gaming ("RMG") content- aggregator Gameiom.

* * *

**2019 Outlook**

We expect to generate total Adjusted EBITDA(4) of $160.0 - $164.0 million in 2019, representing growth of approximately 17% - 20% compared to 2018.

We further expect 2019 capital expenditures to be in the range of $65.0 - $69.0 million, compared to $66.2 million in 2018, reflecting an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, which includes units recently purchased from Integrity.

56.     Additionally in the earnings release, Defendant Lopez was quoted touting the Company's rapid growth in its first year as a public company, specifically highlighting growth in the EGM Segment, stating in relevant part:

> "We ended our first year as a public company with a solid fourth quarter and 35% growth in annual revenue," said Chief Executive Officer David Lopez. "Our continued top line growth, increased operating cash, and free cash flow generation reflects the industry-leading performance of our products and AGS' unique position given how underrepresented we are in the market. These two factors contributed to our phenomenal growth in electronic gaming machines ("EGMs"), ending the year with more than 4,300 sold units, a 71% increase from fiscal 2017. We kicked off 2019 with the close of our acquisition of Integrity Gaming Corp., which bolsters our recurring revenue footprint and provides long-term optimization opportunities. With new product and content launches, further penetration of both new and early-entry markets, and international expansion, AGS is positioned for another high-growth year in 2019."

57.     That same day, PlayAGS filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results, which was signed by defendants Lopez and Akiona.  The report stated that the Company's disclosure controls and procedures were effective.  It also stated "management has concluded that our system of internal control over financial reporting, as of December 31, 2018, is effective."

58.     Finally, on March 5, 2019, PlayAGS held an earnings call with analysts and investors to discuss the Company's fourth quarter 2018 financial results.  On the call, Defendant Akiona attributed the increase in the Company's EGM install base primarily to its Oklahoma market, stating in relevant part:

> Our domestic EGM installed base grew by over 200 units year-over-year despite the voluntary removal of 500 machines in Texas earlier in the year and the reduction of 420 VLT units in Illinois through an end of lease buyout by a customer. As David mentioned earlier, these units were not counted in our sold unit count. Excluding the end of lease buyout of the Illinois VLT units in the fourth quarter, we would have had net placements of 650 recurring units sequentially, with the majority of those units being placed in Oklahoma.

59.     Defendant Akiona also touted that the Company's legacy EGM optimization strategy was driving domestic RPD growth, stating in relevant part: "Domestic RPD for the

20

current quarter increased by $0.53 to $26.41 compared to the fourth quarter of 2017, driven

primarily by our new product offerings through the ongoing optimization of our installed base

with our leading EGMs."

60.     Additionally on the call, Defendant Lopez informed investors that PlayAGS was

well-positioned to further penetrate its existing markets, including Oklahoma, stating in relevant

part:

> The second initiative is the ramping of Orion Slant and our STAX
> Table Progressive, two relatively new products that are seeing
> strong momentum as we start 2019. We highlighted the progress
> both products made in the fourth quarter, exiting the year strong to
> prepare for an even better 2019. With 25 titles planned for launch
> on Orion Slant throughout the year and a growing number of
> compelling case studies that prove STAX drive increased revenue
> for customers, we believe both products will be significant needle
> movers in their respective business segments this year. The third
> initiative is new product introductions, and we have several that
> we're excited about this year. We saw the first unit of Dex S card
> shuffler go into a select couple of properties on trial in December.
> The feedback has been encouraging, consistent and informative in
> this introductory stage. We're currently in a handful of properties
> and right where we want to be with the rollout, having just
> completed some enhancements to prepare us for a broader launch.
> By Q2, we believe we'll be in position to ramp up the rollout to
> several jurisdictions, including California, Florida, Oklahoma,
> Nevada, Michigan and New Mexico to start.
>
> * * *
>
> The fourth initiative is penetration into new and early-entry
> markets. Slide 12 shows the many markets where AGS remains
> well under our 5% market share goal. We remain focused on
> working to secure some new licenses this year, but we believe that
> the bigger opportunity is placing incremental EGM and table units
> into new markets like Canada, Pennsylvania and Ohio as well as
> further growth in Oklahoma, California and Wisconsin to name a
> few.

61.     Finally, in response to analyst questions regarding the Company's ability to

further grow its recurring revenues, Defendant Lopez specifically called out Oklahoma as a

"strong jurisdiction" to generate recurring revenues in 2019, stating in relevant part:

> Yes. So I think that when you look at recurring -- our recurring
> footprint, and I'll speak to that number sort of globally. When
> we're expanding in 2019, obviously, it's going to be sort of like
> equal opportunity sort of like placements for leases. But again,
> we're going to be right back in our very strong jurisdictions like
> Oklahoma. We're going to see real growth in Mexico again. We're
> obviously going to see going to see some international or what I'd

say is true international growth because I sort of look at Mexico as almost domestic, but we'll see some true international growth with leased units in the Philippines. So when you put those altogether, we've got real opportunities for recurring revenue growth in 2019 that, I think, that will shape up very nicely versus what we did even in 2018. But I think it's the usual suspect that can -- when you look at the domestic opportunities being led again -- once again by the state of Oklahoma.

62.     On May 8, 2019, PlayAGS announced its first quarter 2019 financial results, reporting quarterly revenues of $73.0 million, up 13 percent year-over-year. The earnings release reported that EGM equipment sales had again increased by 33 percent, based on quarterly sales of 1,024 units. Finally, the Company reiterated its previous 2019 guidance. The press release stated, in relevant part

**First Quarter 2019 Financial Highlights**

- Total revenue increased 13% to $73.0 million, driven by continued growth in our EGM segment, primarily sold units in early-entry markets such as Michigan, Saskatchewan, Pennsylvania and Massachusetts, as well as continued penetration into ramping markets such as Florida and California in addition to the contribution of leased EGMs acquired from Integrity Gaming Corp. ("Integrity") in February 2019.

- EGM equipment sales revenue increased 33% to $20.2 million, driven by the sale of 1,024 units, of which nearly 55% were sold into early-entry markets.

- Record gaming operations revenue, or recurring revenue, grew to $52.9 million, or 7% year-over-year, driven by the acquisition of Integrity, growth and performance of our international installed base, and an increase in Table Products revenue.

- Net loss attributable to PlayAGS, Inc. of $0.1 million improved year-over- year from a net loss of $9.5 million.

- Total Adjusted EBITDA (non-GAAP)(1) increased to $36.3 million, or 5%, driven by the increase in revenue, offset by increased adjusted operating expenses, primarily due to headcount related costs in SG&A and R&D as well as an additional $1.0 million of operating costs from iGaming.

\* \* \*

**2019 Outlook**

Based on our year to date progress, we continue to expect to generate total adjusted EBITDA of $160 - $164 million in 2019, representing growth of approximately 17% - 20% compared to the

22

prior year period. We also continue to expect 2019 capital expenditures to be in the range of $64 - $69 million, compared to $66.6 million in 2018, reflecting an expectation for a continued increase in our installed base in both existing and new markets as well as our ongoing yield optimization initiative, including units recently purchased from Integrity.

63.     Additionally in the earnings release, Defendant Lopez was quoted touting the Company's EGM growth, stating in relevant part:

"I'm pleased to report another solid quarter of growth for AGS, with total revenue of $73 million up 13% year-over-year, driven by double-digit gains in EGMs and Tables," said Chief Executive Officer David Lopez. "Sold EGM units grew 22% year-over-year and our Tables Products segment reported its strongest quarter to date, driven by our award-winning progressive platforms. Our EGM recurring revenue installed base grew 14% year-over-year to 27,308 units, driven by the inclusion of 2,500 EGMs from the Integrity acquisition which we closed in February of this year. With numerous levers to build momentum - including strategic investments in R&D to continue building a strong, diversified and expanded product portfolio, as well as many new and underpenetrated domestic and international markets - AGS is well-positioned for continued long-term, meaningful growth."

64.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019, affirming the previously reported financial results. The report also stated that the Company's disclosure controls and procedures were effective.

65.     Also on May 8, 2019, PlayAGS held an earnings call with analysts and investors to discuss the Company's first quarter 2019 financial results. On the call, Defendant Lopez touted the growth prospects for the Company's Class II EGM footprint in its Oklahoma market, stating in relevant part:

Just last month, we announced that we have renewed our contract with Chickasaw Nation, securing our installed base of approximately 3,200 recurring revenue games across their 22 casinos in Oklahoma. The deal represents a significantly larger installed base of Class II games than what -- than what our previous contract covered, as we have added around 700 units within that time frame. Because of our strong relationship with the tribe, we are pleased to have signed this agreement ahead of the contract expiration date. In fact, we are hosting our fourth annual GameON Customer Summit at their world-class Windstar property in Oklahoma, which boasts the largest slot floor in the world.

66.     The above statements identified in ¶¶ 37-65 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business,

operations, and prospects.  Specifically, the Exchange Act Defendants failed to disclose to investors that: (i) PlayAGS' growth strategies were failing; (ii) the Company was experiencing major execution issues in Oklahoma; (iii) therefore, the Company's purported competitive strengths were not reasonably likely to lead to increased revenue; (iv) the Company's internal controls over financial reporting were not effective; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

67.     Moreover, under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), Defendants Lopez and Akiona were required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations," in PlayAGS' reporting with the SEC.  Defendant Lopez and Akiona's failure to disclose adverse material trends in the Company's quarterly and annual reports violated Item 303, because these undisclosed facts were known to Defendants and would have an unfavorable impact on the Company's financial results.

### C.     The Truth Is Revealed

68.     The true state of PlayAGS' financial well-being, growth prospects, and internal controls over financial reporting were revealed to investors on August 7, 2019, when the Company reported its second quarter 2019 results.  On that date, PlayAGS shocked the market by reporting a net loss of $7.6 million, or negative $0.21 earnings per share (versus expectations of positive $0.14 per share).  This loss included an impairment of goodwill of $3.5 million and an impairment of intangible assets of $1.3 million related to the acquired AGS iGaming business within its Interactive segment.  The Company additionally  reported disappointing quarterly revenues of $74.5 million (or growth of 2 percent year-over-year), and adjusted EBITDA of $35.7 million (down 2 percent year-over-year).  PlayAGS also lowered its full-year 2019 adjusted EBITDA guidance to a range of $145 million to $150 million (or growth of 6 to 10

percent year-over-year), down from its previous guidance for a range of $160 million to $164 million.

69.     PlayAGS attributed the weak results to product underperformance at three Oklahoma properties and problems with its placement of 800 incremental EGMs into the Oklahoma market over the past year, as well as the iGaming impairment charges and an increase in research and development operating expenses as part of its strategic growth initiatives.

70.     That same day, on an earnings call with analysts and investors, Defendant Lopez provided additional detail on these issues, stating:

> [W]e are experiencing some challenges in Oklahoma, where we have our largest base of recurring revenue, EGM.
>
> We mentioned several factors for decreased [revenue per day] earlier and one of the issues we are actively working to fix is product underperformance.  I'll give you some color on what's driving this.  **Over the past year**, we've grown our Oklahoma footprint with 800 incremental units and separately optimized numerous existing units.  Some of the underperformance is a result of going too hard and fast into the market with certain products.  We also went too deep into our portfolio of titles, where we should have focused on our most successful game themes.

(emphasis added).

71.     In reaction to these disclosures, analysts expressed their concerns and immediately downgraded PlayAGS stock.  The news was such a surprise to Bank of America Merrill Lynch that it downgraded its rating on PlayAGS stock by two levels (from "Buy" to "Underperform") and slashed its PlayAGS price target from $30 to $14 on concerns of faltering growth.

72.     On this news, the Company's share price fell $8.99, or nearly 52 percent, to close at $8.31 per share on August 8, 2019, on unusually heavy trading volume.

V.     **UNDISCLOSED ADVERSE FACTS**

73.     At all relevant times, the market for PlayAGS common stock was open, well-developed and efficient.  As a result of these materially false and/or misleading statements, and/or failures to disclose, PlayAGS common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class that purchased or otherwise acquired

the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to PlayAGS, and have been damaged thereby.

74.     During the Class Period, the Exchange Act Defendants materially misled the investing public, thereby inflating the price of PlayAGS common stock, by publicly issuing false and/or misleading statements and/or omitting  material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.

75.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, the Exchange Act Defendants made, or caused to be made, a series of materially false and/or misleading statements about PlayAGS's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  The Exchange Act Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing or otherwise acquiring the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

76.     During the Class Period, as alleged herein, the Individual Exchange Act Defendants acted with scienter in that the Individual Exchange Act Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

1  dissemination of such statements or documents as primary violations of the federal securities

2  laws.

3      77.    The Individual Exchange Act Defendants permitted PlayAGS to release these

4  false and misleading statements and failed to file the necessary corrective disclosures, which

5  artificially inflated the value of the Company's common stock.

6      78.    As set forth herein, the Individual Exchange Act Defendants, by virtue of their

7  receipt of information reflecting the true facts regarding PlayAGS, their control over, receipt,

8  and/or modification of the Company's allegedly materially misleading statements and omissions,

9  and/or their positions with the Company that made them privy to confidential information

10  concerning PlayAGS, participated in the fraudulent scheme in violation of the Exchange Act as

11  alleged herein.

12      79.    The Individual Exchange Act Defendants are liable as participants in a fraudulent

13  scheme and course of conduct that operated as a fraud or deceit on those who purchased

14  PlayAGS common stock by disseminating materially false and misleading statements and/or

15  concealing material adverse facts.  The scheme deceived the investing public regarding

16  PlayAGS's business, operations, and management and the intrinsic value of PlayAGS common

17  stock and caused Plaintiff and members of the Class to purchase PlayAGS common stock at

18  artificially inflated prices.

19  **VII.    LOSS CAUSATION/ECONOMIC LOSS**

20      80.    The Exchange Act Defendants' wrongful conduct, as alleged herein, directly and

21  proximately caused the economic loss suffered by Plaintiff and the Class.

22      81.    During the Class Period, Plaintiff and the Class purchased or otherwise acquired

23  PlayAGS common stock at artificially inflated prices and were damaged thereby.  The price of

24  the Company's common stock significantly declined when the misrepresentations made to the

25  market, and/or the information alleged herein to have been concealed from the market, and/or the

26  effects thereof, were revealed, causing investors' losses.

27

28

CLASS ACTION COMPLAINT

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

82.     Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

83.     The Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a)     the omissions and misrepresentations were material;

(b)     the Company's common stock traded in an efficient market;

(c)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(d)     Plaintiff and other members of the Class transacted in PlayAGS Common Stock between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.     At all relevant times, the markets for PlayAGS Common Stock were efficient for the following reasons, among others:

(a)     as a regulated issuer, PlayAGS filed periodic public reports with the SEC;

(b)     PlayAGS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     PlayAGS was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     throughout the Class Period, PlayAGS Common Stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "AGS."

85.     As a result of the foregoing, the market for PlayAGS Common Stock promptly digested current information regarding PlayAGS from all publicly available sources and reflected such information in PlayAGS's stock price.  Under these circumstances, all those who purchased or otherwise acquired PlayAGS common stock during the Class Period suffered similar injury through sales of PlayAGS common stock at artificially inflated prices and the presumption of reliance applies.

86.     Alternatively, a Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on the Exchange Act Defendants' material misstatements and/or omissions.  Because this action involves the Exchange Act Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that the Exchange Act Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.     NO SAFE HARBOR

87.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PlayAGS who knew that the statement was false when made.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against the Exchange Act Defendants

88.     As previously stated, the claims set forth herein pursuant to Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, are based on knowing or reckless misconduct by the Exchange Act Defendants.  These claims are independent of the Securities Act Claims asserted herein, and the allegations pertaining to the claims under the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief under the Securities Act, as asserted herein.

89.     Plaintiff repeats and realleges each and every allegation contained in paragraphs ¶¶ 26-87 as if fully set forth herein.

90.     During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their transactions in PlayAGS common stock during the Class Period.

92.     Plaintiff and the Class have suffered damages in that, as a result of the Exchange Act Defendants' wrongful conduct alleged herein, they purchased or otherwise acquired PlayAGS common stock at artificially inflated prices.  Plaintiff and the Class would not have purchased PlayAGS common stock at the prices they did, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

93.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or other acquisitions of PlayAGS common stock during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Exchange Act Defendants, Apollo, and Apollo Group**

94.     Plaintiff repeats and realleges each and every allegation contained in paragraphs ¶¶ 26-95 as if fully set forth herein.

95.     The Individual Exchange Act Defendants, Apollo, and Apollo Group acted as controlling persons of PlayAGS within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about PlayAGS, the Individual Exchange Act Defendants, Apollo, and Apollo Group, as culpability participants, had the power and ability to control the actions of the Company and its employees.  By reason of such conduct, the Individual Exchange Act Defendants, Apollo, and Apollo Group are liable pursuant to Section 20(a) of the Exchange Act.

**X.      SUBSTANTIVE ALLEGATIONS FOR CLAIMS UNDER THE SECURITIES ACT**

96.     The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are brought on behalf of persons or entities who purchased or otherwise acquired PlayAGS common stock pursuant and/or traceable to the PlayAGS Offering Materials.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, they do not allege, and do

not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims.

### A.   Parties

97.   Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired PlayAGS stock on and/or traceable to the August 2018 SPO, and was damaged thereby.

98.   Defendant PlayAGS is incorporated under the laws of Nevada with its principal executive offices located in Las Vegas, Nevada.

99.   Defendant Lopez, at all relevant times, was PlayAGS' CEO, as well as a Director of the Company.  Defendants Lopez  signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings which were all filed with the SEC.

100.   Defendant Akiona, at all relevant times, was the CFO of the Company. Defendant Akiona signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

101.   Defendant David Sambur ("Sambur"), at all relevant times, was a Director of the Company and Chairman of its Board.  Defendant Sambur signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

102.   Defendant Daniel Cohen ("Cohen"), at all relevant times, was a Director of the Company and signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

103.   Defendant Eric Press ("Press"), at all relevant times, was a Director of the Company and signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

104.   Defendant Yvette Landau ("Landau"), at all relevant times, was a Director of the Company and signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

105.    Defendant Adam Chibib ("Chibib"), at all relevant times, was a Director of the Company and signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings, which were all filed with the SEC.

106.    Defendant Geoff Freeman ("Freeman") was a Director of the Company at the time of the March 2019 SPO.

107.    For the purposes of the Securities Act claims alleged herein, Defendants Lopez, Akiona, Sambur, Cohen, Press, Landau, Chibib, and Freeman may hereafter be referred to at times as the "Individual Securities Act Defendants."  As directors and/or executive officers of the Company, the Individual Securities Act Defendants participated in the solicitation and sale of PlayAGS shares to investors in the PlayAGS Offerings for their own benefit and/or the benefit of PlayAGS and Apollo Group.

108.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the August 2018 SPO.

109.    Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter for the August 2018 SPO.

110.    Defendant Jefferies LLC ("Jefferies") served as an underwriter for the August 2018 SPO and March 2019 SPO.

111.    Defendant Macquarie Capital (USA) Inc. ("Macquarie") served as an underwriter for the August 2018 SPO.

112.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the August 2018 SPO.

113.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the August 2018 SPO.

114.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the August 2018 SPO.

115.    Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") served as an underwriter for the August 2018 SPO.

CLASS ACTION COMPLAINT

116.    Defendant Nomura Securities International, Inc. ("Nomura") served as an underwriter for the August 2018 SPO.

117.    Defendant Roth Capital Partners, LLC ("Roth Capital") served as an underwriter for the August 2018 SPO.

118.    Defendant Union Gaming Securities LLC ("Union Gaming") served as an underwriter for the August 2018 SPO.

119.    Defendant The Williams Capital Group, L.P. ("Williams") served as an underwriter for the August 2018 SPO.

120.    Defendant Apollo Global Securities, LLC ("Apollo Global Securities"), an affiliate of Apollo, served as an underwriter for the August 2018 SPO.

121.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the March 2019 SPO.

122.    For the purposes of the Securities Act claims alleged herein, Credit Suisse, Deutsche, Jefferies, Macquarie, Merrill Lynch, Citigroup, Stifel, SunTrust, Nomura, Roth Capital, Union Gaming, Williams, Apollo Global Securities, and Morgan Stanley may hereafter be referred to at times as the "Underwriter Defendants."

123.    Defendant Apollo, through Apollo Group, acquired PlayAGS in 2013.  At the start of the Class Period, Apollo beneficially held over 50 percent of the Company's common stock.

124.    Defendant Apollo Gaming, as part of Apollo Group, acquired PlayAGS in 2013. At the start of the Class Period, Apollo Gaming held over 50 percent of the Company's common stock.

125.    Defendant Apollo Investment, as part of Apollo Group, acquired PlayAGS in 2013.  Apollo Investment is a member of Apollo Gaming GP, the general partner of Apollo Gaming.  At the start of the Class Period, Apollo Investment beneficially held over 50 percent of the Company's common stock.

126.    Defendant VoteCo, as part of Apollo Group, acquired PlayAGS in 2013.  At the start of  the Class Period, VoteCo beneficially held over 50 percent of the Company's common

1    stock pursuant to an irrevocable proxy granting it sole voting and sole dispositive power with

2    respect to the shares held by Apollo Gaming.  VoteCo is owned and controlled by Apollo

3    affiliates.

4         127.    For the purposes of the Securities Act claims alleged herein, Defendants

5    PlayAGS, the Individual Securities Act Defendants, the Underwriter Defendants, Apollo, and

6    Apollo Group, may hereafter be referred to at times as the "Securities Act Defendants."

7         **B.      False and Misleading Statements in the August 2018 SPO Documents**

8         128.    On August 6, 2018, PlayAGS filed the Shelf Registration Statement with the SEC

9    on Form S-3, which was declared effective by the SEC on August 8, 2018.  Pursuant to the Shelf

10   Registration Statement, the Company registered for resale, on behalf of Apollo Gaming,

11   18,970,161 shares of common stock, for an offering price of up to $1 billion, which shares were

12   permitted to be sold on a rolling basis.  The Shelf Registration Statement forms part of the

13   August 2018 SPO Documents.

14        129.    Pursuant to the Shelf Registration Statement, on August 10, 2018, the Company

15   filed a prospectus supplement on Form 424B1 with the SEC, which together with the Shelf

16   Registration Statement, forms part of the August 2018 SPO Materials.  In the August 2018 SPO,

17   PlayAGS, on behalf of Apollo Gaming, registered for resale up to an aggregate of 6,325,000

18   shares of its common stock, including the underwriter allotment of 825,000 shares, at the public

19   offering price of $29.25 per share.  Net of underwriting discounts and commissions, the August

20   2018 SPO was valued at $154,037,812.50.  Directly prior to the August 2018 SPO, Apollo and

21   Apollo Group beneficially held approximately 52 percent of PlayAGS common stock, and

22   beneficially held approximately 34 percent following its completion.

23        130.    The August 2018 Documents touted the Company's competitive strengths, stating

24   in relevant part:

25        *High-Margin, Recurring Revenue Model with Attractive Payback
          Periods on Newly Deployed Capital*

26
          Approximately 76% of our revenue in the LTM period was derived
27        from products that we leased to our customers and recurring
          revenue from our Interactive gaming operations. This strong base
28        of recurring, contracted, high-margin revenue generated a 53%
          EGM adjusted EBITDA margin during the LTM period, which

reflects the strong performance and longevity of our game titles
and long-term relationships with our key customers. The cash flow
generated from our recurring revenue sources has provided us with
a stable source of capital to grow our footprint both domestically
and internationally. Given the high-margin, recurring-revenue
nature of our new EGMs, we benefit from payback periods on our
leased units of only approximately 12 months for our core units
and approximately 8 months for our premium units.

***Best-in-Class R&D Teams that Produce Industry-Leading
Products***

Our R&D teams have demonstrated industry leadership by creating
several top-performing titles and innovative hardware designs,
such as our newly-introduced premium cabinet, Orion Slant, which
features a unique slanted top that has a more comfortable
ergonomic design for players. The innovative nature of our
products has, in part, led to approximately 84% of our customer
base electing to purchase at least one of our recently-released
ICON or Orion cabinets. As reflected in the charts below, our
casino-owned EGMs outperform those from all other suppliers,
generating win per day 1.7 times higher than the house average.
Our premium leased games were the second-best across the
industry, delivering win per day that was 2.2 times higher than the
average of the casino floors where our machines are placed.

131.   The August 2018 SPO Documents further touted the Company's growth
strategies, including the optimization of its legacy EGMs and the placement of Class II EGMs in
the Company's existing markets, stating in relevant part:

***Optimize Yield Across our Existing Footprint***

We believe there is a significant opportunity to optimize the older
EGMs in our existing installed base with newer, more profitable
cabinets. By improving the performance of our installed base, we
will generate incremental EGM adjusted EBITDA since our
participation model enables us to share in the profitability of the
EGMs that we place in our customers' gaming facilities. We
currently have an installed base of approximately 3,200 older
cabinets that we believe, over time, can be upgraded with our
newer cabinets to generate higher win per day. Since 2016, we
have optimized over 3,000 of our cabinets, which has led to
approximately $8.3 million of incremental revenue, approximately
100% of which flows to EGM adjusted EBITDA. A specific
example of this took place at the WinStar World Casino and Resort
in Oklahoma, in which we optimized 28 underperforming legacy
EGMs by replacing them with our new Orion cabinet, which
resulted in a significant increase in incremental revenue. When
annualized, the effect of this optimization results in an increase in
incremental revenue of nearly $1.0 million. Another benefit of our
yield optimization program is that we can take the older units from
domestic casinos, refurbish them for approximately $1,500 and
redeploy them in Mexico. These redeployed units broaden our
international footprint and generate a high return on investment

given the low cost to refurbish the units. Based on FY 2017 revenue per day and related refurbishment expenditure figures, we estimate that our return on investment for each refurbished unit that is leased into the Mexican market is 172%.

\* \* \*

***Further Expand Our Class II Market Leadership and Continue Growth of our Recurring Revenue Base***

We believe that our existing core Class II product offering is among the strongest in the industry and we are committed to growing our existing Class II installed base. Currently, we believe we are the second largest supplier of Class II games in the United States. We expect to continue gaining market share in our existing Class II jurisdictions as we introduce more games and new hardware, and we also intend to enter new Class II jurisdictions we have acquired 58 new Class II licenses in the past three and a half years. In the first quarter of 2018, there was a sizable Native American casino that opened and our Class II placements represented nearly 15% of the property's floor. We believe that the unique advantages offered by Class II gaming will result in Native American operators continuing to grow the number of Class II units that they have in their casinos. Given our existing leadership in the Class II market, we feel that we are very well-positioned to capture our share of this continued growth in Class II.

132.    The August 2018 SPO Documents also reaffirmed that Oklahoma was the Company's most important market, stating in relevant part:

Oklahoma is our largest market and our EGMs in the state accounted for approximately 22% of our total revenue for the last twelve months ended June 30, 2018. Our largest customer is the Chickasaw Nation, a Native American gaming operator in Oklahoma, which accounted for approximately 11% of our total revenue for the last twelve months ended June 30, 2018. The revenues we earn from the Chickasaw Nation are derived from numerous agreements, which are up for renewal in 2019.

133.    Further, the August 2018 SPO Documents incorporated by reference the risk disclosures as contained in the Company's 2017 annual report on Form 10-K, filed with the SEC on March 14, 2018. These included boilerplate risk disclosures related to the sustainability of PlayAGS' Oklahoma Business, as well as its internal controls over financial reporting, stating in relevant part:

***We are continuing to improve our internal controls over financial reporting.***

Our independent registered public accounting firm is not required to audit the effectiveness of our internal control over financial reporting until after we are no longer an "emerging growth

37

company," as defined in the JOBS Act, which at the latest would be the end of the fiscal year following the fifth anniversary of the initial public offering. At such time, our internal controls over financial reporting may be insufficiently documented, designed or operating, which may cause our independent registered public accounting firm to issue a report that is adverse.

\* \* \*

**State compacts with our existing Native American tribal customers to allow Class III gaming could reduce demand for our Class II games and our entry into the Class III market may be difficult as we compete against larger companies in the tribal Class III market.**

Most of our Class II Native American tribal customers have entered into compacts with the states in which they operate to permit the operation of Class III games. While we seek to also provide Class III alternatives in these markets, we believe the number of our Class II game machine placements in those customers' facilities could decline, and our operating results could be materially and adversely affected. As our Native American tribal customers continue to transition to gaming under compacts with the state, we continue to face significant uncertainty in the market that makes our business in these states difficult to manage and predict and we may be forced to compete with larger companies that specialize in Class III gaming. We believe the establishment of state compacts depends on a number of political, social, and economic factors that are inherently difficult to ascertain. Accordingly, although we attempt to closely monitor state legislative developments that could affect our business, we may not be able to timely predict if or when a compact could be entered into by one or more of our Native American tribal customers. For example, in Oklahoma, the continued introduction of Class III games since the passage of the tribal gaming compact in 2004 may put pressure on our revenue and unit market share and our revenue share percentages and may result in a shift in the market from revenue share arrangements to a "for sale" model.

\* \* \*

**For the year ended December 31, 2017, two customers were each responsible for approximately 11% of our total revenue and we generated approximately 24% and 11% of our total revenue in the states of Oklahoma and Alabama, respectively.**

For the year ended December 31, 2017, approximately 24% of our total revenue was derived from gaming operations in Oklahoma, and approximately 11% of our total revenue was from one Native American gaming tribe in that state. Additionally, for the year ended December 31, 2017, approximately 11% of our total revenue was derived from gaming operations in Alabama, and approximately 11% of our total revenue was from one Native American gaming tribe in that state. The significant concentration of our revenue in Oklahoma and Alabama means that local economic, regulatory and licensing changes in Oklahoma or

Alabama may adversely affect our business disproportionately to changes in national economic conditions, including adverse economic declines or slower economic recovery from prior declines. While we continue to seek to diversify the markets in which we operate, changes to our business, operations, game performance and customer relationships in Oklahoma or Alabama, due to changing gaming regulations or licensing requirements, higher taxes, increased competition, declines in market revenue share percentages or otherwise, could have a material and adverse effect on or financial condition and results of operations. In addition, changes in our relationship with our two largest customers, including any disagreements or disputes, a decrease in revenue share, removal of electronic gaming machines or non-renewal of contracts, could have a material and adverse effect on our financial condition and results of operations.

Moreover, neighboring states such as Kansas, Texas and Arkansas have passed or could pass gaming legislation, which could take market share from Oklahoma gaming facilities or otherwise negatively impact the Oklahoma gaming market and, as a result, negatively impact our results of operations.

134.   The August 2018 SPO Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the August 2018 SPO Documents were materially false and misleading in that they omitted to state: (i) PlayAGS' growth strategies were failing; (ii) the Company was experiencing major execution issues in Oklahoma; (iii) therefore, the Company's purported competitive strengths were not reasonably likely to lead to increased revenue; (iv) the Company's internal controls over financial reporting were not effective; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

135.   Moreover, under applicable SEC rules and regulations, the August 2018 SPO Documents were required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

**C.     False and Misleading Statements in the March 2019 SPO Documents**

136.   Pursuant to the Shelf Registration Statement, on March 20, 2019, the Company filed a prospectus supplement on Form 424B1 with the SEC, which together with the Shelf Registration Statement, forms part of the March 2019 SPO Materials.  In the March 2019 SPO,

PlayAGS, on behalf of Apollo Gaming, registered for resale up to an aggregate of 4,000,000 shares of its common stock at the public offering price of $25.50 per share.  Net of underwriting discounts and commissions, the March 2019 SPO was valued at $100,000,000.  Directly prior to the March 2019 SPO, Apollo and Apollo Group beneficially held approximately 33 percent of PlayAGS common stock, and beneficially held approximately 22 percent following its completion.

137.    The March 2019 SPO Documents, as did the August 2018 SPO Documents, included the Shelf Registration Statement, and therefore made the same representations regarding the Company's competitive strengths, growth strategies, as well as its Oklahoma business, as discussed in ¶¶ 130-132

138.    Finally, the March 2019 SPO Documents incorporated the risk disclosures as contained in the Company's 2018 annual report on Form 10-K, filed with the SEC on March 5, 2019.  These included boilerplate risk disclosures related to the sustainability of PlayAGS' Oklahoma Business, as well as its internal controls over financial reporting, stating in relevant part:

> **We are continuing to maintain our internal controls over financial reporting.**
>
> Our independent registered public accounting firm is not required to audit the effectiveness of our internal control over financial reporting until after we are no longer an "emerging growth company," as defined in the JOBS Act, which at the latest would be the end of the fiscal year following the fifth anniversary of the initial public offering. At such time, our internal controls over financial reporting may be insufficiently documented, designed or operating, which may cause our independent registered public accounting firm to issue a report that is adverse.
>
> * * *
>
> **State compacts with our existing Native American tribal customers to allow Class III gaming could reduce demand for our Class II games and our entry into the Class III market may be difficult as we compete against larger companies in the tribal Class III market.**
>
> Most of our Class II Native American tribal customers have entered into compacts with the states in which they operate to permit the operation of Class III games. While we seek to also provide Class III alternatives in these markets, we believe the number of our Class II game machine placements in those

customers' facilities could decline, and our operating results could be materially and adversely affected. As our Native American tribal customers continue to transition to gaming under compacts with the state, we continue to face significant uncertainty in the market that makes our business in these states difficult to manage and predict and we may be forced to compete with larger companies that specialize in Class III gaming. We believe the establishment of state compacts depends on a number of political, social, and economic factors that are inherently difficult to ascertain. Accordingly, although we attempt to closely monitor state legislative developments that could affect our business, we may not be able to timely predict if or when a compact could be entered into by one or more of our Native American tribal customers. For example, in Oklahoma, the continued introduction of Class III games since the passage of the tribal gaming compact in 2004 may put pressure on our revenue and unit market share and our revenue share percentages and may result in a shift in the market from revenue share arrangements to a "for sale" model.

* * *

**We generate a substantial amount of our total revenue from two customers and in two states.**

For the year ended December 31, 2018, approximately 22% of our total revenue was derived from gaming operations in Oklahoma, and approximately 11% of our total revenue was from one Native American gaming tribe in that state. Additionally, for the year ended December 31, 2018, approximately 9% of our total revenue was derived from gaming operations in Alabama, and approximately 9% of our total revenue was from one Native American gaming tribe in that state. The significant concentration of our revenue in Oklahoma and Alabama means that local economic, regulatory and licensing changes in Oklahoma or Alabama may adversely affect our business disproportionately to changes in national economic conditions, including adverse economic declines or slower economic recovery from prior declines. While we continue to seek to diversify the markets in which we operate, changes to our business, operations, game performance and customer relationships in Oklahoma or Alabama, due to changing gaming regulations or licensing requirements, higher taxes, increased competition, declines in market revenue share percentages or otherwise, could have a material and adverse effect on or financial condition and results of operations. In addition, changes in our relationship with our two largest customers, including any disagreements or disputes, a decrease in revenue share, removal of electronic gaming machines or non-renewal of contracts, could have a material and adverse effect on our financial condition and results of operations.

139.    The Company's 2018 annual report, incorporated by reference in the March 2019 SPO Documents, also made the following representations concerning the Gameiom acquisition, including the consideration paid for its goodwill, stating in relevant part:

41

CLASS ACTION COMPLAINT

*AGS iGaming*

During the quarter ended June 30, 2018, the Company acquired all of the equity of Gameiom Technologies Limited (formerly known as "Gameiom", currently known as "AGS iGaming"). AGS iGaming is a licensed gaming aggregator and content provider for real-money gaming ("RMG") and sports betting partners. The acquisition was accounted for as an acquisition of a business and the assets acquired and liabilities assumed were measured based on our preliminary estimates of their fair values at the acquisition date. The estimated fair values of assets acquired and liabilities assumed and resulting goodwill are subject to adjustment as we finalize our fair value analysis. The significant items for which a final fair value has not been determined as of the filing of this report include the fair value of intangible assets. We expect to complete our fair value determinations no later than one year from the acquisition date.

We attribute the goodwill acquired to our ability to utilize AGS iGaming's existing RMG platform to distribute our existing EGM game content into many markets, diversification of our Interactive segment's product portfolio that now includes a real-money gaming solution and other strategic benefits. The total consideration for this acquisition was $5.0 million, which included cash paid of $4.5 million and $0.5 million of deferred consideration that is payable within 18 months of the acquisition date. The consideration was preliminarily allocated primarily to goodwill that is not tax deductible for $3.7 million and intangible assets of $2.1 million, which will be amortized over a weighted average period of approximately 6.7 years years [sic].

The intangible assets consist primarily of customer relationships and a technology platform.

140.    The March 2019 SPO Documents were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the March 2019 SPO Documents were materially false and misleading in that they omitted to state: (i) PlayAGS' growth strategies were failing; (ii) the Company was experiencing major execution issues in Oklahoma; (iii) therefore, the Company's purported competitive strengths were not reasonably likely to lead to increased revenue; (iv) the Company's internal controls over financial reporting were not effective; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

CLASS ACTION COMPLAINT

141.     Moreover, under applicable SEC rules and regulations, the March 2019 SPO Offering Documents were required to disclose known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

**D.     Post-Offering Events**

142.     On August 7, 2019, PlayAGS shocked the market by reporting a net loss of $7.6 million, or negative $0.21 earnings per share (versus expectations of positive $0.14 per share). This loss included an impairment of goodwill of $3.5 million and an impairment of intangible assets of $1.3 million related to the acquired AGS iGaming business within its Interactive segment.  The Company also reported disappointing quarterly revenues of $74.5 million (or growth of 2 percent year-over-year), and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $35.7 million (down 2 percent year-over-year).  PlayAGS also lowered its full-year 2019 adjusted EBITDA guidance to a range of $145 million to $150 million (or growth of 6 to 10 percent year-over-year), down from its previously issued guidance for a range of $160 million to $164 million.

143.     PlayAGS attributed the weak results to product underperformance at three Oklahoma properties and problems with its placement of 800 incremental EGMs into the Oklahoma market over the past year, as well as the iGaming impairment charges and an increase in research and development operating expenses as part of its strategic growth initiatives.

144.     That same day on an earnings call with analysts and investors, Defendant Lopez provided some detail about these issues, stating:

> [W]e are experiencing some challenges in Oklahoma, where we have our largest base of recurring revenue, EGM.
>
> We mentioned several factors for decreased [revenue per day] earlier and one of the issues we are actively working to fix is product underperformance.  I'll give you some color on what's driving this.  ***Over the past year***, we've grown our Oklahoma footprint with 800 incremental units and separately optimized numerous existing units.  Some of the underperformance is a result of going too hard and fast into the market with certain products.  We also went too deep into our portfolio of titles, where we should have focused on our most successful game themes."

(emphasis added).

43

145.    In reaction to these disclosures, analysts expressed their concerns and immediately downgraded PlayAGS stock.  The news was such a surprise to Bank of America Merrill Lynch that it downgraded its rating on PlayAGS stock by two levels (from "Buy" to "Underperform") and slashed its PlayAGS price target from $30 to $14 on concerns of faltering growth.

146.    By the commencement of this Action, PlayAGS stock was trading as low as $3.58 per share, an approximately 88 percent decline from the $29.25 per share August 2018 SPO price, and 86 percent decline from the $25.50 per share March 2019 SPO price.

### COUNT III

**For Violation of Section 11 of the Securities Act**
**Against PlayAGS, the Individual Securities Act Defendants, and the Underwriter Defendants**

147.    As previously stated, the claim set forth herein pursuant to Section 11 of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim.  This claim does not sound in fraud.

148.    Plaintiff repeats and incorporates each and every allegation contained in ¶¶ 96-146 as if fully set forth herein, excluding any allegation of fraud, recklessness, or intentional misconduct.

149.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant PlayAGS, each of the Individual Securities Act Defendants, and each of the Underwriter Defendants..

150.    The Shelf Registration Statement in the PlayAGS Offering Materials was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

151.    PlayAGS is the registrant and issuer of the common stock sold pursuant to the PlayAGS Offering Materials' Shelf Registration Statement.  As such, PlayAGS is strictly liable

for the materially inaccurate statements contained in that registration statement and the failure of that registration statement to be complete and accurate.  By virtue of the PlayAGS Offering Materials containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, PlayAGS is liable under Section 11 of the Securities Act to Plaintiff and the Class.

152.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Shelf Registration Statement were true and without omissions of any material facts and were not misleading.

153.    The Individual Securities Act Defendants each signed the PlayAGS Offering Materials' Shelf Registration Statement and caused its issuance.  The Individual Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statement contained in that registration statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Individual Securities Act Defendants' failure to exercise reasonable care, the Shelf Registration Statement contained material misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.  As such, each of the Individual Securities Act Defendants is liable under Section 11 of the Securities Act to Plaintiff and the Class.

154.    Each of the Underwriter Defendants served as an underwriter for the August 2018 SPO and/or March 2019 SPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Shelf Registration Statement.  Each of the Underwriter Defendants, as an underwriter of the securities offered in the August 2018 SPO and/or March 2019 SPO pursuant to the Shelf Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Shelf Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of

material fact that would make the statements misleading.  By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Shelf Registration Statement contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.  As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Plaintiff and the class.

155.    None of the untrue statements or omissions of material fact in the Shelf Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Shelf Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

156.    Each of the Securities Act Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the registration statement, which misrepresented and failed to disclose, *inter alia*, the fact set forth above.  By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

157.    Plaintiff and the Class have sustained damages.  The value of PlayAGS common stock has declined substantially subsequent to and due to violations by the Securities Act Defendants named in this Count.

158.    At the time of their purchases of PlayAGS common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT IV

### For Violation of Section 12(a)(2) of the Securities Act
### Against the Securities Act Defendants

159.     As previously stated, the claim set forth herein pursuant to Section 12(a)(2) of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim.  This claim does not sound in fraud.

160.     Plaintiff repeats and incorporates each and every allegation contained in ¶¶ 96-158 as if fully set forth herein, excluding any allegation of fraud, recklessness, or intentional misconduct.

161.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against PlayAGS, the Individual Securities Act Defendants, the Underwriter Defendants, Apollo, and Apollo Group.

162.     Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchases of the Company's common stock pursuant to the defective prospectuses which respectively formed in relevant part the PlayAGS Offering Materials.  The actions of solicitation by the Securities Act Defendants include participating in the preparation of the false and misleading prospectuses and marketing the common stock to investors, such as Plaintiff and other members of the Class.

163.     The prospectuses contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

164.     Each of the Securities Act Defendants owed Plaintiff and other members of the Class who purchased or otherwise acquired PlayAGS common stock pursuant to the prospectuses issued in connection with the PlayAGS Offering Materials a duty to make a reasonable and diligent investigation of the statements contained in the prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to

---

CLASS ACTION COMPLAINT

be stated in order to make the statements contained therein not misleading.  By virtue of each of the Securities Act Defendants' failure to exercise reasonable care, the prospectuses contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

165.    Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with the prospectuses at the time they purchased or otherwise acquired PlayAGS common stock.

166.    By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased or otherwise acquired PlayAGS common stock pursuant to the prospectuses issued in connection with the PlayAGS Offering Materials sustained substantial damages in connection therewith.  Accordingly, Plaintiff and the other members of the Class who hold the common stock issued pursuant to the prospectuses issued in connection with the PlayAGS Offering Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their PlayAGS common stock seek damages to the extent permitted by law.

167.    Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which this complaint is based to the time that Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this count is brought were offered to the public and the time Plaintiff filed this action.

### COUNT V

**For Violation of Section 15 of the Securities Act**
**<u>Against the Individual Securities Act Defendants, Apollo, and Apollo Group</u>**

168.    As previously stated, the claim set forth herein pursuant to Section 15 of the Securities Act is based solely on strict liability and negligence, and is not based on any knowing

or reckless conduct by or on behalf of any defendant—*i.e.*, it does not allege, and does not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud claim.  This claim does not sound in fraud.

169.    Plaintiff repeats and incorporates each and every allegation contained in ¶¶ 96-167 as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

170.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Securities Act Defendants, Apollo, and Apollo Group.

171.    The Individual Securities Act Defendants each were controlling persons of PlayAGS by virtue of their positions as directors and/or senior officers of PlayAGS and/or Apollo and/or Apollo Group.  The Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of PlayAGS, including Apollo and Apollo Group.  Certain of the Individual Securities Act Defendants, as outlined in ¶¶ 98-105, signed the Shelf Registration Statement issued in connection with the PlayAGS Offerings and were responsible for its contents.

172.    Apollo and Apollo Group were the majority owners and controlled the Company leading up to the August 2018 SPO.  In addition to controlling a majority of PlayAGS's voting shares at that time, Apollo and Apollo Group also appointed and had significant influence over the Company's management and majority of its Board.  They also were parties to various shareholder agreements with each other and the Company that gave them even further control of the Company above and beyond the amount of their voting control, as defined herein.

173.    Apollo, Apollo Group, and Individual Securities Act Defendants, each were culpability participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in the Cause of Action above, and exercised control over PlayAGS based on their having signed or authorized the signing of the Shelf Registration Statement, selling PlayAGS shares in the

PlayAGS Offerings and/or having otherwise participated in the process that allowed the PlayAGS Offerings to be successfully completed.

174.    By reason of the conduct alleged herein, these Defendants violated Section 15 of the Securities Act and Plaintiff and the members of the Class have suffered harm as a result

**XI.    CLASS ACTION ALLEGATIONS AS TO ALL CLAIMS ASSERTED HEREIN**

175.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired: (i) PlayAGS common stock throughout the Class Period; and/or (ii) pursuant and/or traceable to the PlayAGS Offering Materials issued in connection with the PlayAGS Offerings (the "Class").  Excluded from the Class are: Defendants; the Excluded D&Os; members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

176.    The members of the Class are so numerous that joinder of all members is impracticable.  In connection with the PlayAGS Offerings, the Company registered 10,325,000 shares of common stock for sale to the investing public on behalf of Apollo Gaming.  Moreover, as of March 2, 2020, PlayAGS reported 35,544,601 total outstanding shares of its common stock. At all relevant times, PlayAGS's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of PlayAGS common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by PlayAGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   whether the Exchange Act Defendants violated the Exchange Act by making material misrepresentations or omissions throughout the Class Period;

(b)   whether the Exchange Act Defendants knew or recklessly disregarded that their statements were false and misleading;

(c)   whether the Individual Exchange Act Defendants, Apollo, and Apollo Group are liable as "controlling persons" under Section 20(a) of the Exchange Act for underlying violations of Section 10(b) of the Exchange Act;

(d)   whether the Securities Act Defendants violated Sections 11 and 12(a)(2) of the Securities Act by negligently misrepresenting or omitting material information in the PlayAGS Offering Documents;

(e)   whether the Individual Securities Act Defendants, Apollo, and Apollo Group are liable as "controlling persons" under Section 15 of the Securities Act for underlying violations of Sections 11 and 12(a)(2) of the Securities Act;

(f)   whether the price of PlayAGS common stock was artificially inflated at the time of the PlayAGS Offerings and throughout the Class Period; and

(g)   to what extent the members of the Class have sustained damages and the proper measure of damages.

178.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

179.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

180.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this Action is a proper class action under Rule 23 of the Federal

Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class

members against the Exchange Act Defendants for the alleged Exchange Act violations alleged

herein, as well as damages and other remedies set forth in the Securities Act in favor of Plaintiff

and other Class Members against the Securities Act Defendants for the Securities Act violations

alleged herein, both jointly and severally, in an amount to be proven at trial, including interest

thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 4, 2020                           Respectfully submitted,

*/s/ Don Springmeyer*
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
Don Springmeyer (SBN 1021)
Bradley S. Schrager (NSB 10217)
Daniel Bravo (NSB 13078)
3556 E. Russell Road, 2nd Floor
Las Vegas, Nevada 89120
Telephone: (702) 341-5200
Facsimile: (702) 341-5300
dspringmeyer@wrslawyers.com
bschrager@wrslawyers.com
dbravo@wrslawyers.com

1
2
3
4
5
6
7

**LABATON SUCHAROW LLP**
Christopher J. Keller (*pro hac to be submitted*)
Eric J. Belfi (*pro hac to be submitted*)
Francis P. McConville (*pro hac to be submitted*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

8

*Attorneys for Plaintiff*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATION

I, Ginger Sigler, as Executive Director of Oklahoma Police Pension and Retirement System ("Oklahoma Police"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this certification on behalf of Oklahoma Police.  I have reviewed a complaint prepared against PlayAGS, Inc. ("PlayAGS"), alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Oklahoma Police did not transact in the securities of PlayAGS at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Oklahoma Police is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Oklahoma Police fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Oklahoma Police's transactions in PlayAGS securities are reflected in Exhibit A attached hereto;

5.      Oklahoma Police sought to serve and was appointed as either a lead plaintiff or representative party in the following class actions filed under the federal securities laws during the last three years:

*Milbeck v. TrueCar, Inc.,* No. 2:18-cv-2612 (C.D. Cal.)
*Oklahoma Police Pension and Retirement System v. Nevro Corporation,*
No. 3:18-cv-5181 (N.D. Cal.)
*Ronge v. Camping World Holdings, Inc.,* No. 1:18-cv-7030 (N.D. Ill.)
*Mo-Kan Iron Workers Pension Fund v. Teligent, Inc.,* No. 1:19-cv-3354 (S.D.N.Y.)
*Plymouth County Retirement System v. Evolent Health, Inc.,* No. 1:19-cv-1031 (E.D. Va.)
*Logan v. ProPetro Holding Corp.,* No. 7:19-cv-0217 (W.D. Tex.)
*Oklahoma Police Pension and Retirement System v. Sterling Bancorp, Inc.,* No. 5:20-cv-10490 (E.D. Mich.)

6.      Oklahoma Police sought to serve as a lead plaintiff but was not appointed in the following class actions filed under the federal securities laws during the last three years:

*Hessefort v. Super Micro Computer, Inc.*, No. 4:18-cv-0838 (N.D. Cal.)
*City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight, Inc.*, No. 1:19-cv-7563 (S.D.N.Y.)

7.     Beyond it's pro rata share of any recovery, Oklahoma Police will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 18th day of June, 2020.

Ginger Sigler
Executive Director
*Oklahoma Police Pension and Retirement System*

## EXHIBIT A

## TRANSACTIONS IN PLAYAGS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 07/09/18 | 2,771.00 | $28.21 | ($78,171.85) |
| Purchase | 07/09/18 | 3,741.00 | $28.29 | ($105,850.10) |
| Purchase | 07/10/18 | 2,078.00 | $28.22 | ($58,640.33) |
| Purchase | 07/11/18 | 471.00 | $28.20 | ($13,281.02) |
| Purchase | 07/11/18 | 2,508.00 | $28.28 | ($70,925.74) |
| Purchase | 07/12/18 | 836.00 | $28.14 | ($23,528.30) |
| Purchase | 07/16/18 | 1,080.00 | $28.43 | ($30,707.32) |
| Purchase | 07/17/18 | 3,344.00 | $28.32 | ($94,697.06) |
| Purchase | 07/17/18 | 3,464.00 | $28.40 | ($98,360.28) |
| Purchase | 08/02/18 | 1,426.00 | $28.49 | ($40,619.61) |
| Purchase | 08/02/18 | 2,395.00 | $28.64 | ($68,584.66) |
| Purchase | 08/02/18 | 2,395.00 | $28.64 | ($68,584.66) |
| Purchase | 08/03/18 | 718.00 | $30.07 | ($21,586.74) |
| Purchase | 08/03/18 | 1,104.00 | $30.36 | ($33,520.75) |
| Purchase | 08/03/18 | 818.00 | $30.87 | ($25,250.51) |
| Purchase | 08/09/18 | 11,907.00 | $29.25 | ($348,279.75) |
| Purchase | 08/10/18 | 5,974.00 | $29.50 | ($176,221.65) |
| Sale | 12/17/18 | -5,048.00 | $22.19 | $112,015.12 |
| Sale | 08/08/19 | -3,716.00 | $6.45 | $23,968.20 |
| Sale | 08/08/19 | -7,431.00 | $6.58 | $48,877.40 |
| Sale | 08/08/19 | -12,954.00 | $7.13 | $92,381.45 |
| Sale | 08/08/19 | -1,162.00 | $7.13 | $8,286.80 |
| Sale | 08/08/19 | -10,745.00 | $7.25 | $77,850.75 |
| Sale | 08/08/19 | -5,974.00 | $7.25 | $43,283.42 |